IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 19, 2013

**CHRISTA GAIL PIKE v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2002-D-2294     J. Randall Wyatt, Jr., Judge**

_____

**No. M2012-01640-CCA-R3-PC - Filed September 30, 2013**

_____

The Petitioner, Christa Gail Pike, appeals the Davidson County Criminal Court's denial of post-conviction relief from her conviction for attempted first degree premeditated murder of a fellow inmate. On appeal, the Petitioner argues that she received ineffective assistance of counsel. Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and JEFFREY S. BIVINS, JJ., joined.

Graham Prichard (at trial) and Ryan C. Caldwell (on appeal), Nashville, Tennessee, for the Defendant-Appellant, Christa Gail Pike.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel Harmon, Assistant Attorney General; Victor (Torry) S. Johnson, III, District Attorney General; and Kathy Morante, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

The Petitioner was indicted by a Davidson County Grand Jury for one count of attempted first degree premeditated murder. The Petitioner was convicted as charged, and the trial court sentenced her as a Range II, multiple offender to a sentence of twenty-five years, which she was ordered to serve concurrently with her prior sentence of death for her first degree premeditated murder conviction. This court affirmed her conviction. State v. Christa G. Pike, No. M2005-00738-CCA-R3-CD, 2006 WL 547997 (Tenn. Crim. App. Mar. 6, 2006), perm. app. denied (Tenn. Aug. 21, 2006).

**Trial.** This court summarized the evidence presented at trial in its opinion:

The origins of this case began during the early morning hours of August 24, 2001, at the maximum security unit of the Tennessee Prison for Women. Due to a fire, three inmates, Patricia Jones, Natasha Cornett, and the defendant, were evacuated from their cells to a recreation cell or cage. A dispute arose between Cornett and the victim, Jones. The defendant intervened by choking the victim into unconsciousness with a heavy shoe or boot lace. The State contended that the defendant made a premeditated attempt to murder the victim. The defendant argued that she was acting to protect a third party, Cornett, from the victim.

Patricia Jones, the victim, testified that due to a fire in her wing of Tennessee Prison for Women she was moved from her cell and placed in an exercise cage. Two other inmates, the defendant and Natasha Cornett, were placed in the same cage. The victim and Cornett began arguing, and Cornett swung at the victim but missed. The victim said she was about to fight Cornett when the defendant came behind her and choked her until she was unconscious.

On cross-examination, the victim stated that during that time she weighed 217 pounds. She estimated she was twice the size of the defendant and three times the size of Cornett. She admitted that she had pled guilty to first degree premeditated murder. The victim estimated that she and the defendant had been incarcerated in the Knox County Jail for one and a half to two years before both were transferred to Tennessee Prison for Women.

The victim related that in the summer of 2001, there had been three fires on the segregation unit that required evacuation of the inmates from their cells. The third fire was on August 24, 2001. The victim expressed her dislike for Cornett because "[s]he got in my face." The victim had on different occasions in the past thrown a bloody Kotex and a shoe in Cornett's face.

On the night of the first fire evacuation, the victim confronted Cornett, but another inmate intervened on Cornett's behalf. The victim said she whipped the unnamed inmate. The defendant was present and witnessed the events but was restrained by handcuffs.

The victim denied hating Cornett but did admit telling a physician that, "I just want to kill her, maybe, come up behind her and split her throat, or catch her when the police ain't around and just beat her until I get tired." On

redirect, the victim expressed her hate for Cornett but denied feeling hatred for the defendant.

Shaunna Fitzgerald, a correctional officer, was working at the Tennessee Prison for Women on the night of August 24, 2001. She testified that she assisted in releasing inmates from their cells due to the fire. Officer Fitzgerald witnessed an argument between Cornett and the victim in the recreational cage. She stated that Cornett swung at the victim and missed. The defendant then went behind the victim and began choking her. The victim fell to the ground on her stomach. Officer Fitzgerald attempted to pull the defendant off the victim, and the defendant stated, "The way you're pulling my hands, you're just helping me choke the bitch." Another guard, Officer Cheatham, responded and moved the defendant away from the victim. Officer Fitzgerald picked up the object used by the defendant to choke the victim. She described it as similar to a drawstring from sweat pants. The defendant had suffered what Officer Fitzgerald described as rope burns on the top of both hands. She stated that the victim was given aid by firemen and was not hospitalized.

Sergeant Dennis Henry, a correctional officer at Tennessee Prison for Women, spoke with the defendant on August 24, 2001, shortly after the incident. He described the defendant's attitude as proud and unremorseful. The defendant stated that if she had been given thirty more seconds "she would have killed the bitch." The defendant made no mention to Sergeant Henry of acting to defend Cornett.

Christie Donoho had served as an internal affairs investigator for the Department of Correction and was the lead investigator in this case. Ms. Donoho interviewed the defendant on October 15, 2001. The recorded interview was played for the jury at trial wherein the defendant described the events of August 24th. She stated that when the inmates were moved from their cells during the fire, the new admissions were placed in one cage, the punitive inmates in another, and the three maximum security inmates in the third cage. The defendant stated that she took a boot lace with her. She said the victim had started fights with other inmates during two prior evacuations. On August 24th, the victim antagonized Cornett, and Cornett swung at the victim and missed. The victim "rared back to hit [Cornett]," and the defendant placed the lace around the victim's neck. The defendant stated that the victim eventually fell to the ground. The defendant then flipped the victim onto her stomach, sat on her, and continued choking her. This continued until officers

-3-

intervened. When asked her intention toward the victim, the defendant said, "I don't wanna say that I intended to kill her but I would say that I didn't care if she died. I wouldn't lose any sleep over it if she did."

Ms. Donoho explained that all inmate phone calls, with the exception of attorney calls, are monitored and recorded. A call from the defendant to her mother was played for the jury. In regard to these charges, the defendant's mother asked the defendant who started the fight. The defendant responded that "nobody really started it. Patricia was running her damn mouth to Natasha. And she is constantly doin it, you know I hate that bitch." The defendant related that when the victim started to hit Cornett, ". . . I said, 'Oh, hell no!' And I wrapped that shoe string around of her and tried to choke the damn life out of her. She was passed out on the ground, Mamma, twitching, foaming at the mouth, her eyeballs were bugged out so far, her eyelids were flipped up."

"I'll betcha if she gets near me, I'm gonna do it again! I'm gonna succeed this damn time! See, now I know the difference between premeditated murder and what happened with Colleen. Cause see, I premeditated the hell out of this. Sure did. If I'd of had thirty more seconds, I'd, we'd have a little chalk line out there in our rec pen, and that bitch would be gone somewhere."

In another recorded phone conversation with an individual named Lisa, the defendant gave a similar account of the choking incident:

Defendant:  I swear to God it was a set-up! And they said, "All max get in the same pen!" They should have known!

Lisa:  Yeah!

Defendant:  Dumb asses!

Lisa:  They are!

Defendant:  They know I hate her!

Lisa:  Yeah.

Defendant:  They know I . . . I . . . . I've gave them all fair warning that I would kill if I ever got near her.

-4-

Lisa:        Yeah.

Defendant:   So, it was a big choker, but I tried!

Lisa:        (laughs) Really?

Defendant:   I mean, seriously! And you know . . . I know the difference now between like, pre-meditated [sic] murder and what happened with Colleen.

Lisa:        Yeah.

Defendant:   Because I definitely pre-meditated [sic] this . . .

Lisa:        Huh-huh . . .

Defendant:   . . . and I never . . . my blood pressure never even went up . . .

Lisa:        Um . . .

Defendant:   . . . I stayed calm the whole damn time! And I mean, it . . . and it was some tragic shit, too!
. . . .

Defendant:   Yeah. Actually, they don't want me nowhere near her . . . I don't blame 'em!

Lisa:        (laughs) I guess not.

Defendant:   Cause that's the way . . . I think that's the way I was . . . just as calming as I am right now. And when . . . when the firemen came out there, and I don't know what they did CPR on her or what . . . cause I mean, she was like seriously unconscious.

Lisa:        Yeah.

Defendant:   If I'd of had 30 more seconds, there'd be like a little chalk line out in our rec pen.

Lisa:        Oh . . .

Defendant:    And I was just so calm.  And after they like brought her back, or whatever, and she was sittin' up there chokin' half to death on the bench . . . and, you know, trying to figure out where the hell she was . . . I . . . I asked her, you know, "Well, how does it feel to almost lose your worthless little life?"

On cross-examination, Ms. Donoho stated that the phone conversation with Lisa occurred on August 29th, and with the defendant's mother on August 30, 2001.  Ms. Donoho stated that the defendant told her that the victim had threatened her before the incident on August 24th.

The defendant testified that she was convicted for first degree murder.  She stated that she had known the victim since March 1995, having first met her at the Knox County Jail.  The defendant stated the victim had often attacked other people during her incarceration.  She related an incident of the victim throwing another inmate into the bars, causing injury.  She stated that the victim had attacked two officers with a hard plastic tray in two separate incidents.  The defendant witnessed the victim attack two inmates who were on crutches.  The defendant said the victim had threatened her life on numerous occasions.  On yet another occasion, the victim attacked an inmate relations coordinator.  She said the victim habitually threatened Natasha Cornett's life.  The victim tried to attack both the defendant and Cornett during the first fire in the summer of 2001.

On the night of August 24th, the defendant stated that she took the lace when she was evacuated from her cell in anticipation of the victim causing problems.  She said she wanted to be able to incapacitate the larger victim.  The defendant stated she used the lace when the victim drew her fist to hit Cornett.  Her stated intention was to protect Cornett.

By way of explaining her phone conversations, the defendant said she was trying to convince her mother that she could protect herself.  The defendant explained her use of "premeditation" during the phone calls as her intent to protect Cornett and herself from the victim.  She said that her only intention was to incapacitate the victim until others could intervene.

On cross-examination, the defendant admitted that she continued to choke the victim after the victim was unconscious and despite Officer Fitzgerald's efforts to stop her.  The defendant said she feared Officer

Fitzgerald could not restrain the victim and that she ceased choking the victim when Officer Cheatham entered the cage.

The defense called Natasha Cornett and two other inmates. Natasha Cornett stated that the victim had threatened her on several occasions. She described how the defendant stopped the victim from attacking her on August 24, 2001. She said the victim raised her hand to hit her, and the defendant choked the victim, pulling her back and down. On cross-examination, Cornett admitted that the defendant continued to choke the victim after the victim had become unconscious, her eyelids were "flipped up" and she was making gurgling noises. Joana Rosa, an inmate, testified that she had been attacked by the victim when she was unable to defend herself. Lethea Sweat, an inmate, stated that she intervened when the victim attempted to attack the defendant and Cornett during the first fire evacuation of August 2001.

Randy Mangrum was the defendant's final witness. He had been a corrections officer since 1982. Officer Mangrum knew both the victim and the defendant. He considered the victim dangerous and always handcuffed her when she was with other inmates.

Christa G. Pike, 2006 WL 547997, at *1-5.

On August 7, 2007, the Petitioner filed a timely pro se petition for post-conviction relief. The Petitioner was subsequently appointed counsel, who filed two amended petitions on the Petitioner's behalf. The post-conviction hearing occurred on April 2, 2012.

**Post-Conviction Hearing.** Patricia Jones, an inmate at the Tennessee Prison for Women, testified that she had been incarcerated since 1996 following her conviction for premeditated first degree murder in Knox County for stabbing an elderly woman 119 times. She admitted that she had assaulted correctional officers approximately ten times. She said that she often assaulted officers when they "talk[ed] crazy" to her, and during those incidents, she would hit the officers until other officers restrained her. She also said that she had assaulted several inmates. Jones admitted that she "always hit first[,]" meaning that she never acted in self-defense. Jones also admitted that she had threatened to kill other individuals at the prison, including the Petitioner and Natasha Cornett, prior to the 2001 incident. She stated that while incarcerated at the Knox County Jail, the Petitioner prevented her from killing an inmate whose head she was holding down in a toilet. She said that the Petitioner also pulled her off of a second inmate whose head she had rammed against the cell bars. In addition, Jones said that the Petitioner prevented her from killing a third inmate that she was choking with a telephone cord. Jones admitted that the Petitioner had also stopped

her from killing additional inmates, other than the ones she had just discussed. She acknowledged that she "blank[s] out" when she "get[s] mad[.]"

Jones said that prior to the incident in this case, she was angry with the Petitioner because the Petitioner had sided with a correctional officer that she despised. Jones said that she would call the Petitioner "a psychopath" and would tell her that "they was going to fry her a[--]." She said she knew that the Petitioner felt like her medication was making her crazy and that she was having trouble sleeping, and Jones admitted that she would bang on the door and shout to wake her up every time she fell asleep. Jones said she was not afraid of the Petitioner.

Jones stated that she informed Cornett that she was going to "beat her and make her pay for what she did to them kids" and that she was going to "kill her to save the State some money." She said the Petitioner knew of the animosity between her and Cornett. Jones said that she was finally able to get to Cornett to hurt her approximately one month before the incident in this case.

On the night that she was choked by the Petitioner, Jones said that she had been placed in a recreational cage with the Petitioner and Cornett because a fire had been set. She said Cornett was "talking trash" to her and when she approached her, Cornett took a swing at her and missed. At that point, Jones decided she was going to "beat [Cornett] in[to] a coma." During the fight, the Petitioner pulled her off of Cornett with a boot lace and saved Cornett from serious injury.

Jones acknowledged that the prosecutor had told her not to mention anything about the Petitioner's death row status at trial. At the time, she thought the prosecutor was telling her not to mention the Petitioner's crime or the details of the crime. She said she made the comment that the Petitioner was on death row because the prosecutor had asked her about the living arrangements at the prison. She claimed that she did not know she was saying something wrong.

Jones said her trial testimony that the Petitioner used a boot lace to try to kill her was truthful. She claimed the offense was premeditated because one of the Petitioner's friends set the fire and because the Petitioner and Cornett had planned for Cornett to distract her so that the Petitioner could kill her.

Natasha Cornett, another inmate at the Tennessee Prison for Women, testified that Jones "constantly" harassed the Petitioner, made noise so that she could never sleep, and screamed so that the Petitioner could never have a conversation with anyone. Cornett said that because of Jones's bullying and the changes to the Petitioner's medication, the Petitioner

was extremely unstable and often cried. In the weeks prior to the incident, Jones had become extremely hostile to the Petitioner and Cornett. She claimed that at the time of the incident, she tried to hit Jones after Jones was "[c]ontinuously" bumping into her in the cage. When she took the swing at Jones and missed, Cornett said she turned her back on Jones because she was embarrassed that she had not made contact with her. Cornett said that she could see Jones "rare back like she was getting ready to hit me" out of the corner of her eye.

On cross-examination, Cornett said she did not believe that the Petitioner would have assaulted Jones if Jones had not tried to hit her when her back was turned. She also stated that she believed the Petitioner "snapped" when she started choking Jones.

Trial counsel testified that he had been a criminal defense attorney for thirty-four years and that he had represented defendants in over a hundred jury trials. He stated that he had gotten involved in the Petitioner's case when co-counsel asked him to assist him. When asked if he or co-counsel made the decisions regarding trial strategy, trial counsel stated, "I would say that it was joint [decision], although I was senior, we were working the case together."

Trial counsel stated that at a hearing the Friday before trial, he had requested that no witnesses mention the Petitioner's death sentence, the death penalty, or death row. He said that at the end of the hearing, the trial court ruled that all mention of the death penalty would be precluded unless the door was opened. Trial counsel did not want the jury to hear that the Petitioner had been previously convicted of murder or that she was on death row because it would have been "overwhelmingly prejudicial" to the case. Trial counsel stated that if the jurors knew that the Petitioner was on death row, they would not care about her case. Although the State privately instructed Jones not to mention that the Petitioner had received the death penalty, Jones testified at trial that the Petitioner was housed on death row. Trial counsel acknowledged that the State had tried to use the fact that the Petitioner was on death row as a motive for her to commit the crime because Jones routinely reminded the Petitioner that she had been sentenced to death.

When the prosecutors returned to the courtroom after talking to Jones, the court asked trial counsel if he wanted it to formally instruct Jones regarding this death row issue, and trial counsel responded that an instruction was unnecessary. Trial counsel said that after Jones mentioned the Petitioner was on death row, he made the decision not to object. He explained, "[T]he last thing I wanted to do at that point was to drive that point home to the jury[.]" He added, "[W]hat I didn't do and I cannot think of a strategic reason to have not done it was move for a mistrial." Trial counsel admitted that he could have moved for a mistrial in a way that did not alert the jury and that he had asked for mistrials in other cases during a break and out of the presence of the jury. He also admitted that by failing to object

or to ask for a mistrial, he waived that issue on appeal except under a plain error analysis. Trial counsel acknowledged that he did not ask the trial court for a curative instruction following Jones's statement about the Petitioner's death row status.

Trial counsel stated that the State filed a motion in limine the morning of the Petitioner's trial to preclude evidence of Jones's violent history. During that hearing, trial counsel argued that Jones's institutional record of her violent acts while incarcerated should be admissible. The court stated that it was not going to allow evidence of Jones's bad acts until after the Petitioner testified about her knowledge of these acts. Trial counsel stated that during cross-examination, Jones said, "I only assault people when they assault me[,]" and "I only [assault] the inmates that put their hands on me." Following this testimony, a hearing out of the presence of the jury occurred in which trial counsel argued that this testimony had opened the door to evidence of Jones's prior acts of violence. Ultimately, the trial court ruled that it would not allow trial counsel to get into these prior acts of violence during Jones's cross-examination but would allow trial counsel to recall Jones as a defense witness to question her about her violent history. Trial counsel acknowledged that he never recalled Jones during his case-in-chief and never made an offer of proof regarding what Jones's testimony would have been regarding these violent acts. Trial counsel stated that he had made a strategic decision not to call Jones as a defense witness:

> By the time we had completed all of the proof, all of the proof was in, minus [Jones] as a potential witness, I felt that we had established to the jury that she was a violent person, that she attacked other people. [The Petitioner], I thought, made a very good witness, very, I thought that she was a very believable witness and she talked about all of the acts of violence she had seen committed by Jones.
>
> My recollection is that we were able to introduce some of that record through at least some of the other witnesses, including correctional officers. We called former Officer Mangram, who in my opinion made it as clear as can be that Patricia Jones was just a bad lady. I didn't know what else she might say that could hurt us, but I felt like I had achieved my goal . . . to make her out to be a very dangerous individual and the kind of person that [the Petitioner] was fearful of as it related to her, Jones, wanting to hurt other people. I felt pretty good about that.

Trial counsel stated that although the evidence presented at trial regarding Jones's violent history was not as specific as Jones's testimony regarding this history at the post-conviction hearing, the jury did hear about Jones "going after other people in Knox County." Trial counsel stated that evidence of Jones's violent acts was a "two edged sword" because while

the defense had an interest in showing that Jones was a violent person based on these violent acts, the State's theory was that the Petitioner tried to kill Jones because she hated her and had conspired with other inmates to kill her. Trial counsel said that if he had been aware that Jones would testify as she had during the post-conviction hearing, namely that the Petitioner had prevented her from killing other inmates in the past, then he "would have brought that in."

On cross-examination, trial counsel stated that he had been involved in "[a]t least a half of a dozen" death penalty cases. He said that Jones had not "made a very good witness in front of the jury[,] and [he] didn't want to give her an opportunity to possib[ly] come back and be a better witness."

Co-counsel testified that he had been practicing criminal law since 2000 and was appointed by the court to represent the Petitioner in 2003. At the time of his appointment, he said he had never tried any jury trials. He acknowledged that he was deferential to trial counsel in making decisions regarding strategy because trial counsel had significantly more legal experience.

Co-counsel stated that he and trial counsel did not object or move for a mistrial out of the presence of the jury when Jones mentioned that the Petitioner was on death row. He said that he did not "remember how clear her mention of the death sentence was in the middle of her testimony" and that he did not remember if he and trial counsel discussed the reasons not to move for a mistrial. When asked if he could remember a strategic reason why the defense did not move for a mistrial, co-counsel stated:

> The only thing I can think of is that [trial counsel] really did quite a [good] job cross-examining [Jones,] the victim in this case[,] and . . . in my opinion, and I believe in [trial counsel's opinion] as well at the time, because I remember talking about this, [Jones] responded to his cross-examination as poorly as we had hoped that she would."

> Jones came across as very angry, violent[,] and I do remember that when he was crossing her[,] I think he asked permission to get very close to her and talk to her with his face just, just right on the other side of the bench that I, that I thought he had her worked up enough that she might come out of the chair at him. I mean, she was using profanity, talking about when she had a messed up day in prison she hurts people . . . .

-11-

Co-counsel agreed with trial counsel that recalling Jones as a defense witness was not worth the risk because "[trial counsel] couldn't have gotten her to testify any worse than [he] already had . . . ."

Co-counsel said that he and trial counsel had never heard Jones say that she would have killed other inmates if the Petitioner had not intervened. He reiterated that he and trial counsel did not make a proffer or attempt to recall Jones at trial.

On cross-examination, co-counsel stated that he agreed with trial counsel that it was a strategic decision not to object when Jones mentioned that the Petitioner was on death row because they did not want to further emphasize this fact to the jury. He also said they were able to present substantial evidence that Jones was a violent woman, and this evidence included testimony from a correctional officer and several inmates. Co-counsel agreed with trial counsel that there would have been some risk to the Petitioner's case if they had recalled Jones to the stand because she was "unpredictable."

At the conclusion of the proof, the post-conviction court took the matter under advisement. On July 5, 2012, the court entered an order denying post-conviction relief. The Petitioner filed a timely notice of appeal.

## ANALYSIS

The Petitioner argues that trial counsel provided ineffective assistance of counsel by failing to object, request a mistrial, or request a curative instruction after Jones testified that the Petitioner was on death row at the time she choked her. She also argues that trial counsel provided ineffective assistance by failing to make an offer of proof to question Jones about her prior violent acts and by failing to recall Jones as a defense witness in order to establish her history of violence, which would have damaged Jones's credibility and would have supported the defense's theory that Jones was the aggressor and that the Petitioner acted in defense of Cornett when she choked Jones. In response, the State argues that the record "overwhelmingly supports" trial counsel's and co-counsel's strategic decisions not to object, pursue a mistrial, or request a curative instruction and not to recall Jones as a defense witness or make a proffer of her testimony. We agree that the Petitioner is not entitled to relief.

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction is void or voidable because of an abridgement of a constitutional right. T.C.A. § 40-30-103. The Tennessee Supreme Court has held:

> A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues,

the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve. The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness.

Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006) (internal quotation and citations omitted). "The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence." Id. (citing T.C.A. § 40-30-110(f); Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006)). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998) (citing Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)).

Vaughn further repeated well-settled principles applicable to claims of ineffective assistance of counsel:

The right of a person accused of a crime to representation by counsel is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. Both the United States Supreme Court and this Court have recognized that this right to representation encompasses the right to reasonably effective assistance, that is, within the range of competence demanded of attorneys in criminal cases.

Vaughn, 202 S.W.3d at 116 (internal quotations and citations omitted).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Id. (citing Strickland v. Washington, 466 U.S. 668, 687 (1984); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996) (citing Strickland, 466 U.S. at 697).

A petitioner successfully demonstrates deficient performance when the clear and convincing evidence proves that his attorney's conduct fell below "an objective standard of reasonableness under prevailing professional norms." Id. at 369 (citing Strickland, 466 U.S. at 688; Baxter, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the

petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. at 370 (quoting Strickland, 466 U.S. at 694).

We note that "[i]n evaluating an attorney's performance, a reviewing court must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." State v. Burns, 6 S.W.3d 453, 462 (Tenn. 1999) (citing Strickland, 466 U.S. at 689). Moreover, "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Strickland, 466 U.S. at 688-89. However, this "'deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (quoting Goad, 938 S.W.2d at 369).

First, the Petitioner argues that trial counsel provided ineffective assistance by failing to object, request a mistrial, or request a curative instruction after Jones testified that the Petitioner was on death row. The record shows that although post-conviction counsel requested that a copy of the trial record be included in the record on appeal, it was not included. Because our review of the trial was necessary to determine whether the Petitioner was entitled to post-conviction relief, we have taken judicial notice of the record from the Petitioner's direct appeal. See State ex rel. Wilkerson v. Bomar, 376 S.W.2d 451, 453 (Tenn. 1964) (concluding that this court may take judicial notice of the direct appeal record).

At trial, the court ruled that all references to the Petitioner's status as a death row inmate were precluded unless the door was opened because "the prejudicial effect, clearly, outweigh[ed] whatever probative value it would have." Prior to Jones's testimony, the two prosecutors assigned to the case had talked to Jones about not mentioning the Petitioner's death row status. On direct examination, the State asked Jones, "Now, prior to that date, you knew Ms. Cornett? They were in [the] seg[regated unit] with you, correct?" Jones responded, "Me and Natasha Cornett has [sic] been on A. Yeah, [a]nd of course, Christa [Pike] was back there locked down, being that she was death row." At that point, the trial court stated, "Let's just get on with what happened . . . ." The State resumed questioning Jones about what happened after she was placed in the recreational cage with Cornett and the Petitioner because of the fire, and Jones did not mention that the Petitioner was on death row again during her testimony.

The post-conviction court specifically held that the Petitioner was not entitled to relief for counsel's failure to object or request a curative instruction following Jones's testimony:

The Petitioner alleges in her Amended Petition for Post-Conviction Relief that trial counsel [and co-counsel] were ineffective at trial by failing to object to Ms. Jones testifying to the jury that the Petitioner was on death row and failing to request a curative instruction. The Court finds that Ms. Jones testified as to the Petitioner's status on death row during her direct testimony when discussing the living arrangements in TPFW [Tennessee Prison for Women] . . . . The Court finds that there was neither a curative instruction requested nor a contemporaneous objection to Ms. Jones'[s] reference about death row. The Court finds that the absence of a request for a curative instruction or a contemporaneous objection to an objectionable fact elicited in a witness'[s] testimony is commonly a strategic decision employed and is designed to not draw more attention to the objectionable fact. The Court finds that this strategy was employed in the Petitioner's case. The Court accredits [trial counsel's] testimony that the lack of an objection or request for a curative instruction was a strategic decision in this case, which was based upon the fact that he did not want to highlight the fact that the Petitioner was on death row. The Court finds that the Petitioner failed to prove, by clear and convincing evidence, that trial counsel's failure to request a curative instruction or make an objection to the reference resulted in ineffective assistance of counsel.

We conclude that the record fully supports the post-conviction court's holding regarding trial counsel's failure to object or request a curative instruction. Trial counsel and co-counsel testified at the post-conviction hearing that they did not object or ask for a curative instruction because they did not want to highlight the fact that the Petitioner was on death row at the time that the Petitioner choked Jones. We agree with the post-conviction court that trial counsel's failure to object or ask for a curative instruction was a strategic decision and, therefore, did not constitute ineffective assistance of counsel.

Next, we must determine whether trial counsel provided ineffective assistance by failing to request a mistrial following Jones's comment. Although the court made findings regarding trial counsel's failure to object and to request a curative instruction, it did not make specific findings regarding trial counsel's failure to request a mistrial. See T.C.A. § 40-30-111(b) (requiring the court to enter an order containing its findings of fact and conclusions of law for each ground raised by the petitioner); Tenn. R. S. Ct. 28, § 9(A) (stating that the order must contain specific findings of fact and conclusions of law for each issue raised by the petitioner). A review of the post-conviction hearing shows that the court heard substantial proof on the mistrial issue. Moreover, the order denying post-conviction relief repeatedly states that the Petitioner failed to prove by clear and convincing evidence that trial counsel was ineffective, and the last paragraph of the order states that the Petitioner failed to carry her burden of proof for post-conviction relief. See Claude F. Garrett v. State, No.

-15-

M2011-00333-CCA-R3-PC, 2012 WL 3834898, at *24 (Tenn. Crim. App. Sept. 5, 2012), perm. app. denied (Tenn. Feb. 25, 2013) (concluding that although the court's order denying post-conviction relief did not contain findings of fact or conclusions of law on the issue of trial counsel's ineffectiveness for failing to request a mistrial, the record was sufficient for appellate review because it contained the trial transcript providing the factual basis of the Petitioner's claims and the post-conviction court's determination that trial counsel's performance was neither deficient nor prejudicial); State v. Swanson, 680 S.W.2d 487, 489 (Tenn. Crim. App. 1984) (holding that although written findings of fact and conclusions of law on each issue facilitate appellate review, reversal is not required when there is an adequate record for review). Here, the trial transcript, the post-conviction transcript, the court's findings of fact and conclusions of law regarding the related issues of trial counsel's failure to object or request a curative instruction, and the court's final holding that the Petitioner failed to prove her allegations by clear and convincing evidence provide an adequate record for our review.

In determining whether trial counsel provided ineffective assistance in failing to request a mistrial, we note that the grant or denial of a motion for a mistrial rests within the sound discretion of the trial court. State v. Robinson, 146 S.W.3d 469, 494 (Tenn. 2004). A trial court should declare a mistrial "only upon a showing of manifest necessity." Id. (citing State v. Saylor, 117 S.W.3d 239, 250-51 (Tenn. 2003)). "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." State v. Reid, 164 S.W.3d 286, 341-42 (Tenn. 2005) (citing State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996)). The party seeking a mistrial has "the burden of establishing the necessity of a mistrial." Id. at 342 (citing Williams, 929 S.W.2d at 388).

Significantly, this court held on direct appeal that Jones's comment regarding the Petitioner's death row status was not "sufficiently prejudicial" to warrant a new trial given the facts of this particular case:

> [T]he defendant contends that the trial court erred in failing to grant a new trial due to a reference in testimony that the defendant was on death row. The defendant maintains that this was so prejudicial as to justify a new trial. The State responds that the issue was waived under Tennessee Rule of Appellate Procedure 36(a) by the defendant's failure to make a contemporaneous objection.

> The defendant had, in a pre-trial motion in limine, successfully argued that the defendant's status as a death row inmate not be introduced. The trial judge had ruled that the prejudicial effect outweighed the probative value.

-16-

During her testimony, the victim was asked about the individuals who were confined with her on the segregated unit on the night of this incident. The victim responded as follows: "Yes. Me and Natasha Cornett has [sic] been on A. Yeah. And of course Christa was back there locked down, being that she was on death row." No contemporaneous objection or motion for mistrial was made by the defendant. The issue was not raised until the filing of the motion for new trial.

We conclude that the defendant has waived this issue by her failure to object or request a curative instruction. Tenn. R. App. P. 36(a). Furthermore, we do not believe the trial judge's refusal to grant a new trial on this basis was an abuse of discretion. Although the unsolicited remark was prejudicial, it was mitigated by the setting in which these events took place. The inmates of the maximum security wing of the Tennessee Prison for Women are generally considered to have attained their status through other than innocent and meritorious means. During the course of the trial it was revealed that the defendant, the victim, Natasha Cornett, and Joana Rosa were all incarcerated for murder convictions. The unsolicited comment was not sufficiently prejudicial under this factual background to warrant a new trial.

Pike, 2006 WL 547997, at *6-7. We agree with this reasoning and conclude that the trial transcript does not show that trial counsel's failure to request a mistrial was prejudicial, given the substantial proof of the Petitioner's guilt and the criminal backgrounds of the parties involved. Although Jones mentioned once, early in her testimony, that the Petitioner was on death row, it was evident to the jury that the Petitioner, Jones, and Cornett all had murder convictions and were all confined in the maximum security wing of the prison. Given the circumstances of this case, we conclude that trial counsel made a strategic decision to continue with the trial rather than request a mistrial, especially after Jones's testimony proved favorable to the defense. Co-counsel testified that trial counsel was extremely successful in showing that Jones was a "very angry" and "violent" individual during his cross-examination of her. In addition, he stated that trial counsel "couldn't have gotten [Jones] to testify any worse [for the State] than [he] already had[,]" which is particularly significant in light of the fact that the Petitioner would have been retried following a mistrial. Moreover, given the facts of this case and the trial court's comment immediately following Jones's statement, it would have been reasonable for trial counsel to believe that the court would not have granted a request for a mistrial and would have, at most, only given a curative instruction to the jury, something that trial counsel and co-counsel had specifically testified they did not want. Upon review, we conclude that Jones's statement regarding the Petitioner's death row status did not give rise to a "manifest necessity" requiring a mistrial. Accordingly, the record

supports the finding of the post-conviction court that the Petitioner failed to establish by clear and convincing evidence that trial counsel was ineffective regarding Jones's statement.

Second, the Petitioner argues that trial counsel provided ineffective assistance by failing to make an offer of proof for the purpose of questioning Jones about her prior bad acts and by failing to recall Jones as a defense witness in order to establish her history of violence. She claims that the offer of proof and recalling Jones would have damaged Jones's credibility and would have supported the defense theory that Jones was the aggressor and that the Petitioner acted in defense of Cornett when she choked Jones. The State argues that even if trial counsel's performance was deficient, the Petitioner failed to prove that the Petitioner suffered prejudice, given that she admitted to multiple individuals that she acted with premeditation when she assaulted Jones. See id. at *3. We agree.

At trial, the court granted the State's motion in limine precluding the admission of Jones's institutional history of violence, with the exception of the incidents the Petitioner knew of at the time she choked Jones and the incident during the earlier fire involving the fight between Cornett and Jones. Following this ruling, trial counsel requested that he be allowed to make an offer of proof with Jones at the end of the day on the issue of her history of violent acts. After the State's re-direct examination of Jones, trial counsel requested that he be allowed to cross-examine Jones about her institutional history of violence on the basis that Jones had opened the door to this issue when she testified that she only fought individuals who fought her. The trial court ruled that the defense would be allowed to question Jones about her history of institutional violence only if it called Jones during its case-in-chief after the Petitioner had testified about her knowledge of Jones's violent acts. Ultimately, trial counsel did not make an offer of proof regarding Jones's testimony on this issue and did not call Jones during the defense's case-in-chief.

The post-conviction court held that trial counsel was not ineffective in failing to make an offer of proof or in failing to call Jones during the defense's proof:

> The Petitioner's next allegation in her Amended Petitioner for Post-Conviction Relief is that trial counsel [and co-counsel] were ineffective [in] failing to introduce evidence of the victim's extensive history of violence including violence within the Department of Corrections and outside it. After hearing the testimony of Ms. Jones at the hearing in this matter and reviewing the exhibits admitted at the hearing, the Court finds that Ms. Jones has an extensive history of violent behavior. The Court finds that Ms. Jones['s] record for violence was not admitted into evidence at trial but many of Ms. Jones'[s] violent incidents were testified to at trial. The Court finds that the Petitioner testified, at trial, to numerous violent incidents involving Ms. Jones,

-18-

both in [the] Knox County jail and in TPFW . . . . The Court finds that the Petitioner was permitted to recall Ms. Jones at trial to testify after the Petitioner had testified regarding her knowledge of Ms. Jones'[s] violent behavior; however, the Petitioner's trial counsel did not do so. The Court notes that [trial counsel] testified at the hearing that he felt that it had been clearly established at the conclusion of the proof that Ms. Jones was extremely violent, and she was an unpredictable witness. The Court accredits trial counsel's strategic decision not to recall Ms. Jones to testify. The Court, however, notes that trial counsel could have made a proffer of Ms. Jones'[s] testimony, but did not do so. The Court finds, despite the failure to make a proffer, that the amount of Ms. Jones'[s] prior violent incidents that were testified to at the trial clearly established Ms. Jones as a very violent person, and any failure by trial counsel to not make a proffer of her testimony did not result in prejudice to the Petitioner. The Court finds that, in addition to Ms. Jones testifying regarding her aggressive tendencies, Ms. Joanna Rosa, an inmate, testified at trial regarding a violent incident at the Knox County jail, wherein Ms. Jones attacked her while Ms. Rosa had a cast on her leg . . . . The Court finds that Ms. L[e]thea Sweat also testified at trial regarding a violent incident involving Ms. Jones, wherein Ms. Jones attempted to attack Ms. Cornett, despite Ms. Cornett being handcuffed at the time . . . . The Court also finds that Mr. Randy Mang[r]um, who worked at TPFW from 1981 to 2001, testified at trial regarding Ms. Jones'[s] tendencies for violent behavior and precautions necessary in dealing with her in the segregation unit . . . . The Court finds that Ms. Jones'[s] tendencies toward violent behavior [were] well established at trial, and the Petitioner failed to establish by clear and convincing evidence that had additional evidence of Ms. Jones'[s] violence [been] presented at trial, the outcome would have been different.

At the post-conviction hearing, trial counsel acknowledged that he did not have a reason for failing to make an offer of proof. However, he stated that he made a strategic decision not to recall Jones as a defense witness because Jones's past violent acts had been established by other witnesses and because the proof showed that Jones was a "very dangerous individual" that routinely hurt people. He added that he did not want to recall Jones because she would have had an opportunity to say something damaging for the Petitioner's case. Trial counsel stated that he did not believe Jones "had made a very good witness in front of the jury [for the State] and [he] didn't want to give her an opportunity to possib[ly] come back and be a better witness." In addition, co-counsel testified that recalling Jones was not worth the risk because she was "unpredictable," and her testimony had been very favorable for the defense. He also stated that Mangrum and several inmates had provided substantial proof that Jones was an extremely violent woman.

We conclude that the record fully supports the post-conviction court's holding that trial counsel's failure to recall Jones or make an offer of proof was not prejudicial. Accordingly, the Petitioner is not entitled to relief.

## CONCLUSION

Upon review, we conclude that the Petitioner has failed to prove by clear and convincing evidence that she received ineffective assistance of counsel. The judgment of the post-conviction court is affirmed.

_____
CAMILLE R. McMULLEN, JUDGE